**FIRST DIVISION
BARNES, P. J.,
GOBEIL and PIPKIN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**July 1, 2024**

# In the Court of Appeals of Georgia

A24A0595. BARRON v. PRITCHETT.

BARNES, Presiding Judge.

In this divorce action between Brian Barron ("Husband") and Bembry Pritchett ("Wife"), Husband appeals from an order denying his motion for a new trial. Husband contends that the trial court erred in finding that the parties' prenuptial agreement was enforceable. He further asserts that the trial court committed legal error when it found that, even if the agreement were otherwise unenforceable under Georgia law, it could be enforced as a matter of equity. As explained more fully below, we find no abuse of discretion by the trial court in concluding the agreement is enforceable. Accordingly, we affirm the final judgment and decree of divorce.

The record shows that the parties had a relatively lengthy romantic history that culminated in a brief marriage. The couple began dating in or around the fall of 2013 and during their relationship, they had unprotected sexual intercourse on a number of occasions. Husband engaged in the intercourse despite his knowledge that he was infected with the Type 2 Herpes Virus. Moreover, Husband failed to disclose his infected status to Wife. In or around 2015, Wife discovered that she had become infected with the virus, and she threatened to file both criminal and civil complaints against Husband. Husband retained an attorney to draft a settlement agreement and release with respect to Wife's claims, and the parties executed that agreement on July 23, 2015.

Under the terms of the settlement, Husband agreed to pay Wife two lump-sum payments of $6,000 each and bi-weekly payments of $438.46, with those payments continuing until the death of one of the parties. Additionally, Husband agreed to maintain a 30-year term life insurance policy with Wife as the sole beneficiary. In exchange, the release portion of the agreement provided:

> [Wife] hereby forever releases, discharges and covenants to hold harmless [Husband] . . . from any and all claims, demands, damages, punitive damages, exemplary damages, costs, expenses, attorney fees,

2

actions and causes of action, expenses, compensation, consequential damage or any other thing whatsoever on account of, or in any way growing out of, any and all known and unknown damages, relative to the alleged [conduct] of [Husband] [as set forth herein]. [Wife] further covenants and agrees to indemnify, defend and hold harmless [Husband] from the claims, if any, of any and all other persons and entities, whether named herein or not, including but not limited to, any health care providers, health care facility, corporation, authority or governmental agency, arising out of such failures. It is the intent of this agreement to release [Husband] from all further liability for such activity, and [Wife] expressly acknowledges and agrees that this indemnification agreement applies to any claims against [Husband] for any additional contribution which may be allegedly required of him as a result of the same.

In 2019, several years after entering the settlement agreement, the parties married. Less than a week before their wedding, they entered the prenuptial agreement at issue. The agreement applies in the event of the dissolution of the marriage. Under that agreement, both Husband and Wife waived any right they may have to receive alimony or property from the other in the event of death or divorce. The prenuptial agreement further provides, in relevant part, that "the parties specifically acknowledge that they have fully acquainted themselves with the net

worth and income . . . and assets of the other party"; that "the parties have agreed that each is economically independent of the other"; and that "[e]ach party covenants and represents to the other that he or she has disclosed to the other the nature and extent of his or her various property, interest and sources of income." Additionally, the agreement affirmed that its execution would not operate to extinguish or modify the 2015 settlement agreement, and that the parties intended the terms and conditions of that agreement to"remain of full force and effect[.]" Finally, the agreement required husband, both during the marriage and upon any dissolution of the same, to "maintain in full force and effect medical and dental insurance policies having the same terms and benefits as presently exist for the benefit of [Wife]." The agreement also required Husband to pay all costs associated with any such policies.

The parties separated in December 2019, two months after they married. In August 2020, husband filed the underlying complaint for divorce, in which he asserted that the prenuptial agreement was void for failure to comply with the requirements of Georgia law Specifically, Husband claimed that the parties' failure to disclose to one another material facts concerning their finances rendered the agreement unenforceable. Wife answered and sought to enforce the prenuptial agreement.

The case proceeded to a bench trial at which Wife testified that her attorney prepared the prenuptial agreement. At the time the couple married, Wife was generally aware of Husband's annual income and his retirement funds. She had also discussed Husband's debts with him, and she knew he had a home mortgage and liens on the two trucks he owned. Wife was also necessarily aware of Husband's monthly expenses under the settlement agreement. With respect to her own assets, Wife stated that when the couple married, she owned her own home with no mortgage. Other assets she owned included two cars, an "outdoor building" and what she described as "valuable furniture." Wife was employed, but she never discussed her general finances with Husband, although she could not remember whether she ever told Husband what funds she had in her bank accounts.

Husband testified that at the time he signed the prenuptial agreement, he was aware he had a right to consult a lawyer about the same, but he chose not to do so. He also confirmed that before entering the prenuptial agreement, the couple never had any financial discussions about debts or assets. He had, however, discussed his salary with Wife at or around the time they entered the settlement agreement. When the couple married, he was aware that wife had a job, but he had no knowledge of her

salary. Additionally, he had no knowledge of Wife's assets explaining that, although he knew she lived in a house, he was unaware she owned it. He did not even know if wife had a bank account, although he assumed she did.

Both parties testified that Husband began paying for Wife's health insurance in 2015, about the time the parties entered the settlement agreement. Husband deducted the amount paid for Wife's health insurance from the amount he otherwise owed her under the settlement agreement each month, and paid the balance of those funds directly to Wife. Notably, however, Husband never testified that he would have refused to enter the prenuptial agreement if he had more knowledge of Wife's finances. Instead, when asked why he executed the agreement, Husband responded that Wife was threatening to sue him for defaulting under the settlement agreement. Husband further explained that the alleged default resulted from the fact that he was not paying Wife the full amount owed under the settlement agreement, but was instead using part of those monies to pay for her health insurance.

After hearing the evidence and receiving briefs on the legal issues, the trial court entered its final judgment and decree of divorce, in which it found the prenuptial agreement enforceable. In doing so, the court acknowledged that the evidence at trial

established that financial documentation was not attached to the prenuptial agreement, and that the parties never discussed the particulars of their financial situations. The court further noted, however, that the parties "had become familiar with their respective standards of living over the course of years, [and] had operated under the existing settlement agreement for years." The court also considered the fact that "[Husband] made no attempt to discover any additional information regarding [Wife's] financial situation or to obtain additional relevant information." Additionally, the court concluded that those things about which Husband alleged he had no knowledge, including "debts, credit card accounts, or specific income, had no bearing on [Husband's] decision to sign the [prenuptial] agreement." The court therefore concluded that the agreement was not "obtained through the nondisclosure of material facts." The court further found that even if the prenuptial agreement could otherwise be considered invalid under Georgia law, those provisions relating to the Husband paying for Wife's health insurance and referencing the parties' prior settlement agreement should be enforced as a matter of equity, based on Husband's conduct in infecting wife with an incurable disease. Thus, the court incorporated the prenuptial agreement into the final judgment and decree.

Following entry of judgment, Husband filed a motion for a new trial, which the trial court denied. Husband then filed an application for discretionary appeal, which this Court granted. This appeal followed.

In *Scherer v. Scherer*, 249 Ga. 635 (292 SE2d 662) (1982), the Supreme Court of Georgia established a three-part test to be employed in determining whether a prenuptial agreement is enforceable. Under that test, the trial court must determine: (1) whether "the agreement [was] obtained through fraud, duress or mistake, or through misrepresentation or nondisclosure of material facts"; (2) whether "the agreement [is] unconscionable"; and (3) whether "the facts and circumstances [have] changed since the agreement was executed, so as to make its enforcement unfair and unreasonable." Id. at 641 (3). "Whether an agreement is enforceable in light of these criteria is a decision made in the trial court's sound discretion." *Alexander v. Alexander*, 279 Ga. 116, 117 (610 SE2d 48) (2005). On appeal, therefore, "we review the trial court's legal holdings de novo, and we uphold the trial court's factual findings as long as . . . there is some evidence in the record to support them." (Citation and punctuation omitted.) *Dodson v. Dodson*, 298 Ga. 117, 118 (779 SE2d 638) (2015).

The burden is on the party seeking enforcement of a prenuptial agreement to demonstrate that all three prongs of the *Scherer* test are satisfied. *Lawrence v. Lawrence*, 286 Ga. 309, 312 (4) (687 SE2d 421) (2009). Husband contends that the trial court erred in finding that Wife's evidence satisfied that the first prong of the *Scherer* test. To meet her evidentiary burden, Wife was required to show that there was no "misrepresentation or nondisclosure of a material fact," *Alexander*, 279 Ga. at 118, and "that the party opposing enforcement entered into the agreement freely, voluntarily, and with full understanding of its terms after being offered the opportunity to consult with independent counsel." (Citation and punctuation omitted.) *Lawrence*, 286 Ga. at 313 (4).

Although the trial court acknowledged that Wife had failed to disclose her assets to Husband prior to the execution of the prenuptial agreement, the court nevertheless held that Wife satisfied the first prong of *Scherer*. To support this holding, the trial court relied on: (1) the fact that the parties "had become familiar with their respective standards of living" over the course of their years-long relationship; ; (2) Husband's failure to make any effort "to discover additional information regarding [Wife's] financial situation or to obtain other relevant

9

additional information"; and (3) the fact that Husband's lack of knowledge as to Wife's assets "had no bearing on [Husband's] decision to sign the . . . agreement." Put another way, the court found that Wife's assets were not a material fact that affected Husband's decision to enter into the prenuptial agreement. On appeal, Husband challenges each of these conclusions.

We agree with Husband that relevant precedent does not support the trial court's reliance on each party's familiarity with the other's standard of living as a substitute for full disclosure of a party's finances. See *Dodson*, 298 Ga. at 118-119 (first prong of *Scherer* not satisfied where, although prenuptial agreement listed "all of Husband's assets, it contain[ed] no values for [those] assets — including the value of Husband's bank accounts and two closely-held businesses owned by him"). Cf. *Mallen v. Mallen*, 280 Ga. 43, 47 (1) (622 SE2d 812) (2005) (affirming enforcement of prenuptial agreement where, although husband's financial statement did not include income, "it did reveal Husband to be a wealthy individual with significant income-producing assets, including an 80% ownership share of the business bearing his name[,]" and having lived with husband for four years prior to marriage, wife knew from their standard of living that husband had significant income from his business).

We also agree with Husband that the trial court erred as a matter of law in finding that he had an obligation to seek information about Wife's finances. Our Supreme Court has made clear "that *Scherer* imposes an affirmative duty of full and fair disclosure of all material facts on parties entering into an [prenuptial] agreement." *Blige v. Blige*, 283 Ga. 65, 70 (2) (656 SE2d 822) (2008). See also *Lawrence*, 286 Ga. at 313 (4) ("Georgia law, like that of virtually every other state, imposes an affirmative duty of pre-execution disclosure on parties to [a prenuptial] agreement."). And "in the absence of a full and fair disclosure, the other spouse does not have a general duty to investigate the assets of the other party." *Dodson*, 298 Ga. at 119.

As to the first prong of *Scherer*, however, the question is not whether there was a misrepresentation of or a failure to disclose financial information. The question is instead a broader one. Specifically, *Scherer* requires a trial court to determine whether there has been a "full and fair disclosure of all *material* facts [by the] parties entering into [a prenuptial] agreement." (Emphasis supplied.) *Blige*, 283 Ga. at 70 (2). See also *Alexander*, 279 Ga. at 118 ("[t]he question before the court was whether there was a misrepresentation or nondisclosure of a material fact," and where the issue was whether wife had knowingly waived her rights to receive any of husband's property,

11

the value of that property constituted a material fact); *Dodson*, 298 Ga. at 118-119 (same); *Blige*, 283 Ga. at 69-72 (2) (same). And as a general rule, it is for the trial court to determine which facts are material to the prenuptial agreement at issue. *Alexander*, 279 Ga. at 117-118.

Here, some evidence, including Husband's own testimony as to his reasons for entering the prenuptial agreement, supports the trial court's finding that, under the circumstances of this case, Wife's finances did not constitute material information. Accordingly, we cannot say that the trial court abused its discretion in finding that Wife satisfied the first prong of *Scherer* and in concluding that the prenuptial agreement was enforceable. We therefore affirm the final judgment and decree of divorce.

*Judgment affirmed. Gobeil and Pipkin, JJ., concur.*